# United States Court of Appeals
## For the First Circuit

No. 13-2520

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXIS AMADOR-HUGGINS, a/k/a/ Negro,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Arza Feldman and Feldman and Feldman were on brief, for appellant.

Susan Jorgensen, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

August 26, 2015

**KAYATTA, Circuit Judge.** Alexis Amador-Huggins was convicted of attempted carjacking resulting in death, 18 U.S.C. § 2119(3), aiding and abetting the same, id. § 2, and use of a firearm resulting in death, id. § 924(j). The district court sentenced him to life imprisonment and also imposed restitution in the amount of $13,332.86. He now appeals his conviction and the order of restitution. Finding no reversible error, we affirm.

## I. Background

Amador-Huggins's appeal trains on a number of the district court's evidentiary rulings. We therefore recite the facts in a "balanced" manner in which we "objectively view the evidence of record." United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015) (internal quotation marks omitted).

In June 2012, seventeen-year-old Stefano Steenbakkers Betancourt departed from his sister's birthday party driving his grandmother's white Lexus. His mother left with his sister and other party guests a few minutes later. As she was driving, Betancourt's mother received a call from Betancourt, who said that another vehicle was hitting[1] him from behind and that he was scared

---

[1] At trial, Betancourt's mother used both the word "bumping" and the word "hitting" to describe what the Jeep was doing to the Lexus. Amador-Huggins presented testimony that when she first spoke to the police, the Spanish word she used to relay what her son had told her in English was "choca[n]do," which defense counsel suggested should be translated as "crashing." Morales, who was in the Jeep and observed the events first-hand, used the word "bump" in his testimony.

and didn't know what to do. His mother told him to read her the license plate number, which he did, and she repeated it over and over to the passengers in her vehicle. The phone then went dead. A bit further on, Betancourt's mother found the Lexus on the side of the road with her son inside, shot in the head. He died three days later.

Law enforcement officers arrested Amador-Huggins and John Anthony Morales Lopez ("Morales"), charging them with attempted carjacking, 18 U.S.C. § 2119(3), use of a firearm, id. § 924(c)(1)(A)(iii), use of a firearm resulting in death, id. § 924(j), and with aiding and abetting each other in furtherance of those crimes, id. § 2.

At Amador-Huggins's trial, the key testimony came from Morales, who pled guilty pursuant to a plea agreement, and who admitted to shooting Betancourt as part of an attempted carjacking. Morales testified to the following:

Amador-Huggins introduced the idea of the carjacking while he and Morales were driving together in a white Jeep, saying that friends of his would pay the two of them $1,500 to carjack an SUV. They drove to a housing project in Catano and got a gun from a man who introduced himself as "El Gordo." They left after about 20 minutes and drove toward Dorado, with Amador-Huggins driving and Morales in the passenger seat. They saw the white Lexus driven by Betancourt and decided to steal it.

Amador-Huggins then explained the plan: he would give the Lexus "a little bit of a bump" and the driver would pull over, thinking it was an accident. At that point, they would pull a gun on the driver. Amador-Huggins bumped the Lexus once; when Betancourt didn't stop, Amador-Huggins bumped it again, this time a little harder. However, Amador-Huggins told Morales he didn't want to hit the Lexus too hard because he was driving his mother's car and didn't want to damage it. Morales also estimated that the traffic was moving at only about 10 to 15 miles per hour.

When Betancourt didn't pull over after a third bump, Morales and Amador-Huggins got "ticked off." Amador-Huggins gave Morales the gun and told Morales that he was going to cut off the Lexus, at which point Morales should do "whatever it took" to get the Lexus. The Jeep pulled in front of the Lexus and Morales got out and shot into the vehicle five or six times. Morales got back into the car, and Amador-Huggins calmly said, "Man. I think you killed him." Amador-Huggins was smiling as he said it.

The two drove back to the housing project in Catano. They found El Gordo with some associates in front of the basketball court. After Amador-Huggins explained what had happened--that they didn't manage to steal a car but they did manage to kill someone--the group "congratulat[ed] [Morales] for what happened" as they hung out, "celebrating."

In addition to the foregoing testimony by Morales, the government also presented: evidence that a white Jeep Compass registered to Amador-Huggins but used by and paid for by his mother bore the exact plate number read by the victim to his mother; testimony by Amador-Huggins's mother that her son had borrowed the Jeep the night of the shooting; highway toll booths records showing the location of the Jeep at various times the night of the attempted carjacking; testimony by an eyewitness to the shooting describing an individual in the Jeep that matched Morales's description; and testimony by a witness who knew them both and saw them together in the Jeep the night of the attempted carjacking. Presumably because of the overwhelming evidence that Amador-Huggins was driving the Jeep that contacted and cut off the victim's car, the defense focused on undermining Morales's testimony that Amador-Huggins had deliberately bumped into the Lexus and that he was a knowing participant in the carjacking.

## II. Analysis

### A. Prior Bad Acts

Amador-Huggins first challenges two comments by Morales that suggested that Amador-Huggins used marijuana and Percocet in the celebration with El Gordo after the attempted carjacking. He argues that those statements are evidence of "prior bad acts" that are inadmissible under Federal Rule of Evidence 404(b). The

parties agree that our review is for abuse of discretion.  See United States v. Appolon, 715 F.3d 362, 371 (1st Cir. 2013).

The events that led to the challenged comments are as follows:  The government sought to introduce Morales's testimony that he and Amador-Huggins had consumed Percocet when they first arrived at El Gordo's apartment to get the gun before the attempted carjacking.  The defense objected and, after a sidebar, the government agreed not to ask Morales about his and Amador-Huggins's drug use unless the defendant inquired into it on cross.  Morales's testimony continued.  When the government asked him to describe the return to the housing project where they celebrated the murder after the attempted carjacking, the following exchange occurred:

> Q.   And what happened when you and Amador Huggins saw Gordo and four of his friends?
>
> A.   Well, at that point he gave him the gun back.  We bought illegal substances there, marijuana, Perco[cet].
>
> [Defense Counsel]:  Same objection, Judge.
>
> [Prosecution]:
> Q.  You bought illegal substances?[2]
>
> A.  Yes, I did.

The defense made no further objection at that time, and the judge did not make a ruling.  A few sentences later, as Morales

---

[2] The government argues in its brief that the "you" in the transcript was emphasized, meaning the sentence should be read as an attempt to limit any damaging effects from the "we."

was still describing the celebration, the following exchange occurred:

Q. And then what happened?

A. At that moment, he with stayed there [sic], and we bought the pills. I had my marijuana, and my Perco[cet], and we bought some beer. And we explained what happened there, and we just continued like that.

The defense did not object to the second statement.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, the Rule also provides that such evidence may be admissible for other purposes, such as to prove motive, opportunity, or intent. Fed. R. Evid. 404(b)(2). When a defendant challenges the admissibility of prior bad acts evidence, this circuit usually asks whether the evidence has "'special relevance,'" meaning it is "relevant for any purpose apart from showing propensity to commit a crime."[3] United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013) (quoting United States v. Rodríguez-Berríos, 573 F.3d 55, 64 (1st Cir. 2009)), cert. denied, 135 S. Ct. 168 (2014).

---

[3] Even if it has special relevance, evidence may still be excluded if the court concludes under Federal Rule of Evidence 403 that its probative value is substantially outweighed by the danger of unfair prejudice. United States v. Habibi, 783 F.3d 1, 4 (1st Cir. 2015). Amador-Huggins makes no Rule 403 argument, however.

- 7 -

Here, we need not engage in this inquiry because it is immediately clear that any possible error from Morales's two stray uses of the word "we" was harmless, meaning it was "highly probable that the error did not contribute to the verdict." United States v. Varoudakis, 233 F.3d 113, 125-26 (1st Cir. 2000) (internal quotation marks omitted). In the context of this case, it could hardly have made any difference to the jury whether Amador-Huggins's celebration of the death of a young man was accompanied by Percocet rather than, for example, milk. In short, any material prejudice flowed from the part of the story to which there was no objection, with the Percocet serving at most like a small match added to a raging conflagration. See United States v. Williams, 985 F.2d 634, 638 (1st Cir. 1993) (erroneous admission of Rule 404(b) evidence was harmless because, in light of the properly admitted evidence, it was unlikely that the 404(b) evidence had prejudicial impact). Any error, if it occurred, was therefore harmless.

## B. Expert Testimony on Bumpers

Amador-Huggins next challenges the district court's denial of his mid-trial request for a continuance to call an expert on bumper damage in response to what he characterized as expert testimony of an FBI agent called by the government. The district court's decision to admit or exclude expert testimony is reviewed

for "manifest abuse of discretion."  United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994).

At trial, Amador-Huggins tried to discredit Morales by arguing that, as Amador-Huggins put it in his brief, Morales's "claims that the Jeep struck the Lexus three times, at 10 to 15 miles per hour, could not possibly be true because, had that occurred, the bumper would have been badly dented," when in fact, the bumper of the Jeep was only scratched.  To counter this argument, the government called an FBI agent, Ruben Marchand, to testify about the damage to the Jeep.  When the government asked Marchand what material bumpers are typically made of, the defense objected on the grounds that Marchand was not qualified as an expert, and that allowing the "unannounced expert testimony" would be "trial by ambush."  The district court overruled the objection, and Marchand testified that late-model vehicles generally have plastic bumpers that are "made to bounce back once [they have] an impact."  He also testified, based on his own experience investigating carjackings that used the bumping technique, that it was not unusual for bumpers to sustain little damage in carjackings because the carjackers don't want to damage the car they are stealing.

After Marchand had testified, defense counsel moved for a continuance and for the court to appoint an expert in bumpers to counter the "expert" testimony of Marchand.  See Fed. R. Evid. 702

- 9 -

(allowing for testimony by expert witnesses).  The district court denied this motion, ruling that Marchand had offered lay testimony based on his on-the-job experience investigating bumpers.  Amador-Huggins now argues that the district court abused its discretion in denying him a bumper expert to counter Marchand's "expert" testimony.

As an initial matter, we are inclined to agree that the district court did not abuse its discretion in finding that Marchand presented only lay testimony.  Marchand did not present himself as an expert, and on cross-examination made it clear that he had no knowledge of bumper resistance or the bumpers' technical specifications.  Rather, his knowledge of bumpers was "rationally based on the witness's perception," Fed. R. Evid. 701(a), acquired in the course of his work as an FBI agent.  See United States v. Habibi, 783 F.3d 1, 4-6 (1st Cir. 2015).  Marchand was not offering a research-backed opinion that under no conditions would a bumper be damaged after being hit at 10-15 miles per hour by a vehicle moving in the same direction.  He was simply rebutting the argument to the contrary--that Morales's testimony "could not possibly be true"--because, in his experience, he had seen bumpers that had been hit under circumstances similar to those Morales described that were not "badly damaged."  And if Marchand's testimony was

not expert testimony under Rule 702, Amador-Huggins's argument fails.[4]

Moreover, if the purpose of the expert testimony was to convince the jury that the events described in Morales's testimony were, according to the laws of physics and the crash-resistance of Jeep Compass bumpers, impossible, the need for such testimony would have been obvious even before trial began. Indeed, in his opening statement to the jury, defense counsel told the jury they would hear testimony that the Jeep was repeatedly hitting the Lexus, but that they would "see that the front part of the Jeep shows no evidence of being involved in a repeated hitting of two cars." Counsel's claims of ambush, then, ring entirely hollow.

Finally, the evidence was overwhelming that, as Morales testified, the white Jeep bumped the Lexus. Why else did Betancourt call his mother to say he was "scared" and read the plate numbers to her? Whether Morales's estimate of 10-15 miles was accurate (and whether it was an estimate of the Lexus's speed or the difference in speed between the vehicles) was simply not

---

[4] Amador-Huggins's argument that the government agreed that Amador-Huggins should be allowed to appoint an expert is also unconvincing. The prosecution's statement that "if the Court is inclined to grant him an expert, he is entitled to present his defense" and similar statements were simply a preface to the prosecution's request that if the court was inclined to allow the expert, that the court should ensure that it should not unduly delay the proceedings.

something that could have made a difference in this case.  The district court therefore did not manifestly abuse its discretion.

## C.    Timing of the Curative Instruction on a Witness's Improper Comment

Amador-Huggins next argues that the district court abused its discretion when it denied his request for a curative instruction to correct an improper comment by an FBI agent at the time it was requested, and instead gave the instruction as part of the jury charge.

The comment came on June 4, when defense counsel was pressing an FBI agent on why she had never used a polygraph.[5]  The agent said "I have never felt the need for [a polygraph].  I have never lost a case either, but I have never used a polygraph."  Defense did not object at the time, and in fact responded by saying, "There's a first time for everything, ma'am?"

On June 6, the next day of trial, defense counsel asked the court to give a curative instruction to the jury "today" that would instruct them to disregard the "never lost a case" comment.  The judge indicated that he would give the instruction at the end of trial, and defense counsel said, "Okay."  The next day, June 7, the district court gave the instruction as part of the jury charge.  Amador-Huggins now argues that the district court erred by not

---

[5] The line of questioning stemmed from evidence that Morales had failed a polygraph.

giving a curative instruction when it was first requested on June 6.

Whether trial counsel's "okay" waived the issue, we need not decide.  Nor need we decide whether our standard of review is for plain error, as the government argues, or for abuse of discretion, as Amador-Huggins argues.  The trial court handled this issue well under any standard.  The moment when the arguably objectionable response from the witness was fresh was lost due to defense counsel's lack of objection.  Amador-Huggins offers no support for the premise that a belated curative instruction need randomly be given on such a minor evidentiary issue stemming from an isolated comment, when the request for such an instruction comes two days after the arguably objectionable testimony and shortly before the end of the evidence.  Indeed, bringing up the instruction out of context may well have highlighted the objected-to testimony as having more significance than it actually possessed.

**D.   Admission of Amador-Huggins's "Star Witness" Statement**

The district court admitted Morales's testimony that Amador-Huggins told him, while they were both being detained before trial, that Amador-Huggins hoped there would not be a "star witness" against him.  The parties agree that our review of how the district court applied the hearsay rules to these facts is for abuse of discretion.  See United States v. Omar, 104 F.3d 519, 522

- 13 -

(1st Cir. 1997). Although the parties debate whether this statement is admissible as a statement against penal interest under Federal Rule of Evidence 804(b)(3), this statement by Amador-Huggins is clearly admissible as a statement of a party-opponent under Rule 801(d)(2)(A). See United States v. Avilés-Colón, 536 F.3d 1, 23 (1st Cir. 2008) (stating that under Rule 801(d)(2)(A), "an out-of-court statement is not hearsay if it is offered against the party and it is the party's own statement"). While the district court seemed to admit the statement under Rule 804(b)(3), this court can affirm the admission "on any independent ground made apparent by the record." United States v. Cabrera-Polo, 376 F.3d 29, 31 (1st Cir. 2004).

**E.    Questioning a Witness about Uncharged Criminal Activity**

Amador-Huggins argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution when it prevented him from questioning a witness about whether the witness had ever committed a crime. We review Confrontation Clause challenges "de novo to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses. But when that threshold is reached, any constraints imposed by the trial court on the extent and manner of cross-examination are reviewed only for abuse of discretion." United States v. Villarman-Oviedo, 325 F.3d 1, 14 (1st Cir. 2003). Amador-Huggins concedes that our review should

be for abuse of discretion, which in the context of the Confrontation Clause requires us to find that the trial judge afforded the defendant a fair opportunity to cross-examine witnesses to establish "a reasonably complete picture of the witness's veracity, bias, and motivation." Stephens v. Hall, 294 F.3d 210, 226 (1st Cir. 2002) (internal quotation marks omitted).

Amador-Huggins argues on appeal that the district court did not allow him to probe into the potential bias of Juan Rodriguez, a witness who testified that, as he was sitting outside smoking marijuana at a housing project in Caguas the night of the attempted carjacking, he saw Morales and Amador-Huggins arrive in a Jeep. Rodriguez was an unwilling witness who testified under a pseudonym and insisted on being brought to the courtroom in shackles to make it clear that he was there involuntarily.

On cross-examination, defense counsel sought to question Rodriguez about his involvement in drug dealing and burglary, but the government objected on relevance grounds under Federal Rules of Evidence 401 and 403, and because neither act was a "crime of honesty" that fell under the purview of Rule 608(b). See Fed. R. Evid. 608(b) (allowing for impeachment of witnesses based on their character for truthfulness or untruthfulness). The district court sustained the objection. On redirect examination, the government asked Rodriguez if he had ever been convicted of a crime, to which Rodriguez answered no. Immediately afterwards, on recross,

defense counsel asked Rodriguez if he had ever "committed a crime." The government objected and the district court sustained the objection. Amador-Huggins now appeals that final ruling.

Amador-Huggins's argument on appeal that his Confrontation Clause rights were violated is that he needed to be able to probe Rodriguez's potential bias and prejudice. He alleges that Rodriguez may have been prejudiced against Amador-Huggins "based on their narcotics relationship," and that the fact that he insisted on appearing shackled suggested bias. However, Amador-Huggins points to nothing in the record to suggest he raised any theory of bias below. See United States v. Figueroa, 818 F.2d 1020, 1025 (1st Cir. 1987) (noting that arguments raised for the first time on appeal are waived). Moreover, the bias theory raised on appeal is premised on something that is not in the record: Amador-Huggins's drug dealings. Amador-Huggins--who objects to evidence that he used Percocet--makes no claim that he wanted to put in evidence of his drug dealings. Thus, his theory for why the disallowed inquiry was necessary to establish a "reasonably complete picture" is speculative, lacking in support for its foundational premise, see United States v. Martínez-Vives, 475 F.3d 48, 53 (1st Cir. 2007), and likely waived. The trial court's ruling was not an abuse of discretion.

## F.    Restitution

Amador-Huggins's final argument is that the district court erred in awarding $13,332.86 in restitution to Betancourt's family.  As defense counsel did not object below, our review is for plain error.  See United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013).  "To show plain error, the appellant must demonstrate: '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'"  Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).  Amador-Huggins cannot so demonstrate.

Betancourt's father, who lives in the Netherlands, claimed $26,665.72 in losses, including funeral expenses for services in both the Netherlands and Puerto Rico, flights for eight family members to attend the funeral in Puerto Rico, hotels for the family, the cancellation fee for Betancourt's private school, and payment to a traumatology institute.[6]  Without discussion, the district court awarded the family $13,332.86.  Amador-Huggins makes two claims of error: that the amount was arbitrary because none of the claimed expenses precisely added up to the amount

---

[6]  The government of the Netherlands reimbursed $3,000 of the family's expenses, so the $26,665.72 represents the family's claimed costs after the reimbursement.

awarded, and that the district court was not authorized to award restitution either for two funerals or for travel expenses under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.[7]

We begin with the latter claim. The MVRA provides that an order for restitution arising from a victim's death shall cover "an amount equal to the cost of necessary funeral and related services." Id. § 3663A(b)(3). The expenses for two funerals totaled $11,057.97. The amount requested on top of that included $15,005.70 in airline fares for eight people between Puerto Rico and the Netherlands, as well as $2,576.56 in hotel fees. Neither party cites any case that speaks one way or the other to the question of whether travel expenses are "necessary . . . related services." Id. § 3663A(b)(3). In the absence of any guidance, we conclude that under these circumstances, where a minor victim's immediate family members lived in a different country, some travel expenses can without plain error be treated as necessary services related to the funeral.

Amador-Huggins also argues that the amount--almost exactly one-half of the expenses listed above that were not reimbursed by the government--was arbitrary. To a certain extent, any line drawing here would be arbitrary, but that does not make

_____

[7] The district court said that the restitution was being awarded under 18 U.S.C. § 3663, which appears to be a misstatement, but any discrepancy is irrelevant because the language Amador-Huggins challenges is identical under both provisions.

it inequitable or unsustainable.  See Sánchez-Maldonado, 737 F.3d at 828 ("A district court's calculation of restitution is not held to standards of scientific precision.  As long as the court's order reasonably responds to some reliable evidence, no more is exigible." (citation omitted)).  Here, the expenses allowed were sufficient to cover only a portion of the claimed expenses related to the funeral that took place in Puerto Rico (thus likely excluding some of the airfare for eight family members traveling from the Netherlands), and none of the expenses for the Netherlands funeral.

In any event, even if the district court's approach was error, we cannot conclude it was plain error that affected Amador-Huggins's substantial rights or seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  Id.

### III.  Conclusion

For the foregoing reasons,[8] we affirm.

---

[8] Because we found no error in the district court's rulings, we also reject Amador-Huggins's claim of cumulative error.

- 19 -