# United States Court of Appeals
## For the First Circuit

No. 23-1227

JEFFREY A. NEECE,

Plaintiff, Appellant,

v.

CITY OF CHICOPEE,

Defendant, Appellee,

SHARYN RILEY,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Montecalvo, Lipez, and Rikelman,
Circuit Judges.

Emily Smith-Lee, with whom SLN Law, LLC was on brief, for appellant.
Meredith G. Fierro, with whom CEK Boston, P.C. was on brief, for appellee.

June 27, 2024

**RIKELMAN, <u>Circuit Judge</u>.** Jeffrey Neece sued the City of Chicopee after the mayor decided not to renew Neece's employment contract. During a jury trial, the parties presented very different accounts of why Neece lost his job. The mayor claimed that Neece was not productive or responsive to his colleagues and had alienated key stakeholders. Neece claimed that the mayor retaliated against him because Neece's testimony in a gender-discrimination case against the city undermined the city's defense. After hearing from both Neece and the mayor, as well as a dozen other witnesses, the jury rejected Neece's retaliation claims. Neece now argues that he is entitled to a new trial because the district court limited the evidence he could present about what he views as a key event: a closed-door meeting between the city's attorneys and the city council about the merits of the gender-discrimination case and the impact of Neece's testimony. We conclude that the district court did not abuse its discretion in limiting evidence about this meeting, which the mayor did not attend, after Neece was unable to show that the mayor ever learned about the details of the meeting. We therefore uphold the jury's verdict and affirm.

## I. BACKGROUND

### A. Relevant Facts

Neece's appeal focuses on "a number of the district court's evidentiary rulings," so we "recite the facts in a

'balanced' manner in which we 'objectively view the evidence of record.'" United States v. Amador-Huggins, 799 F.3d 124, 127 (1st Cir. 2015) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)).

### 1. Neece's Role in City Government

In 2013, the then-mayor of Chicopee, Michael Bissonnette, appointed Neece as the superintendent of the Department of Public Works ("DPW"). Under his employment contract, Neece was appointed to a five-year term from June 17, 2013, to June 30, 2018. In early 2014, Richard Kos took office as mayor, after defeating Bissonnette in the November election. Kos ("the mayor") then became Neece's direct supervisor for the rest of Neece's contract with the city.

As the superintendent of DPW, Neece was responsible for supervising nine departments that work to improve and maintain the city's infrastructure, including the highway, parks, water, and sanitation departments, as well as the Central Maintenance Garage. The garage, which figures prominently in this case, repairs city vehicles (and should not be confused with a parking garage).

At trial, the parties presented competing narratives about Neece's job performance. For instance, the mayor testified that he initially had a favorable impression of Neece, but, during his first year in office, he began to "los[e] faith in [Neece's] decision-making." He attributed that change to several key events,

- 3 -

including Neece's recommendation that the city purchase an $80,000 asphalt recycler to fix potholes. After Neece advocated for the equipment, the mayor expended political capital to convince the city council to approve the purchase, only to have Neece discover later that the recycler would not work properly. The mayor was disappointed, not only because he felt Neece could have discovered that fact earlier, before the mayor made the pitch to the city council, but also because Neece did not inform him that the equipment was never purchased; the mayor learned of that fact only months later, when he happened to ask Neece how the recycler was working. The mayor also discussed Neece's delay in providing essential information for a state grant application that had to be submitted in person in Boston, which caused the application to be delivered at the last minute. By contrast, Neece explained that, although the city council had appropriated funding for the recycler, he realized the problem with the equipment before any city money was used to purchase it, and the mayor never expressed any concerns regarding this incident at the time. Neece also testified that, while he was DPW superintendent, the city did not miss out on any grant opportunities.

Other city employees who testified at trial corroborated the mayor's account, though, again, Neece offered a different version of events. The employees stated that Neece was often difficult to reach, did not respond to questions or concerns raised

in emails, and handled employee discipline inappropriately. For example, they recounted that Neece disciplined several water-department employees for not plowing snow during a snowstorm even though they were not obligated to do so and two of the employees were not even scheduled to work the day of the storm. A union then filed grievances against the city on behalf of some of those employees, leading the city to retract the discipline. Also, one veteran DPW employee testified that working under Neece's supervision was so challenging that he opted to retire early. Yet, Neece, for his part, described the many hours he dedicated to the nine departments under his supervision and asserted that human resources and the city's legal department reviewed the disciplinary letters he sent to the water-department employees.

## 2. The Huber Case and Neece's Testimony

Neece's retaliation claims in this case hinge on his testimony in a lawsuit against the city ("the Huber case"), which challenged a hiring decision at the Central Maintenance Garage. In December 2015, the city posted a job opening for a motor equipment repair person at the garage. One woman, Nicholle Huber, applied for the job and was rated as the top candidate by those who interviewed her. The job posting stated that the position would require the employee to lift and/or move up to 100 pounds. But during Huber's interview, Neece, who believed he had final say on all hiring decisions within DPW departments, told Huber that

she did not need to meet the lifting requirement. And yet, Huber's job offer was rescinded when she could not lift 100 pounds during a pre-employment physical examination. Huber sued the city, alleging that it had discriminated against her on the basis of gender during the hiring process.

In October 2017, Neece provided deposition testimony in Huber's case. He testified that, the day after Huber was interviewed, he and his assistant spoke to Alfred Ryczek, the head of the Central Maintenance Garage. According to Neece, Ryczek told them that he was afraid of a sexual-harassment suit if a woman were hired to work at the garage, that he was concerned about what the city would do if Huber became pregnant, and that men in the garage already were making derogatory jokes about how they would behave in Huber's presence.[1] In addition, Neece testified that he informed the director of human resources, as well as the city solicitor, that if the city did not hire Huber even though she was the best qualified candidate, it may face a gender-discrimination lawsuit and would "basically be defenseless" because of Ryczek's comments and Huber's hiring process. Neece also testified that he told the mayor what Ryczek had said about hiring a woman to work in the garage. Emails between Neece and his assistant documenting

---

[1] Ryczek admitted he told Neece's assistant he was concerned about what he would do if Huber became pregnant "[b]ecause there was no light duty in the garage," but he denied making any of the other comments Neece described.

- 6 -

Ryczek's comments were exchanged as part of discovery in the case.

### 3. The City Council Executive Session

Following mediation in the Huber case, Marshall Moriarty, the city solicitor, and Mark Albano, the city's lead trial attorney for the case, met with the mayor and recommended that the city settle the lawsuit for $140,000. The mayor accepted the recommendation but needed the city council to approve the settlement and appropriate the funds.

So, pursuant to the mayor's order, the city council held an executive session -- a non-public meeting -- on April 24, 2018, to consider whether to approve the settlement. The mayor was not present at the executive session.

Neece's evidentiary challenges on appeal center on the details of this meeting. There, Albano discussed with city council members the merits of the Huber case, why he believed it was in the city's best interest to settle, and Neece's role in the case. Albano explained that the lawsuit was "one of the better, if not the best employment discrimination cases [he had] ever seen" because Huber had "direct evidence of discrimination." That evidence, he stated, came from Neece and Neece's assistant, who "indicated that Al [Ryczek] said to them[:] [W]e don't want women in the garage. . . . I'm deathly afraid of having women there. I know it's discriminatory[,] but it is what it is."

According to Albano, Neece had testified in his

deposition that he considered Ryczek's statements to be discriminatory and Huber to have been treated unfairly because Neece told her that being able to lift 100 pounds was not important for the job. Albano also noted that "[g]enerally, the Chicopee employees, the director of the department, [and] the assistant director are [the city's] best witnesses," but "[i]n this case they're [the city's] nightmare witnesses." Although those witnesses "swore to tell the truth and must believe they're telling the truth," he explained, "it's a truth that is very unpalatable from the [c]ity's point of view in terms of prevailing in this case." Because the potential damages and attorneys' fees award could far exceed the $140,000 settlement amount, Albano recommended that the city council approve the settlement. In doing so, he stated that "[i]t's very unpalatable in the mayor's office and in the law department to be paying this amount of money, but the case represents a series of missteps and mistakes . . . that . . . have mushroomed . . . into a big problem."

Following Albano's presentation, several city council members expressed their frustration with Huber's hiring process and the department-head infighting it reflected. One city council member told Albano: "I hope that you'll take the message back to the [m]ayor that we need some in service training, so that they get on the same page when hiring people.

That . . . nobody . . . should be undercutting the other guy, because it just means we're gonna lose if they go to court." Similarly, city council members were displeased that Neece and Ryczek could not "work together" with the human resources department to determine whether the lifting requirement could be waived. One member, Joel McAuliffe, requested "information from the [m]ayor and from the law department to at least let [the city council] know what has been done to address the issues that allowed this to transpire," especially because those involved in the hiring process were "still in leadership positions" in city government. Another asked whether Neece had been disciplined for "[t]elling someone something that wasn't true." Albano advised not taking disciplinary action while the case was pending to avoid the appearance of retribution or retaliation.

In an open session held one week later, the city council voted to appropriate $140,000 to settle the Huber case.

### 4. Non-Renewal of Neece's Contract

Meanwhile, in March 2018, after Neece's deposition testimony in the Huber case but before the city attorneys advised the mayor to accept the proposed settlement, the mayor issued a written warning to Neece about his job performance. The warning summarized several alleged deficits with Neece's work, identified corrective actions, and requested that Neece submit weekly reports on his projects. This was the first time the mayor documented any

perceived concerns with Neece's performance. The mayor testified at trial that he was prompted to issue the March warning because Neece had recently sent an email to members of the parks and recreation commission, who are volunteers, insisting they hire his preferred candidate to be the superintendent of the parks department. The mayor believed the email "verged on bullying." The mayor went on to testify that, when he reviewed Neece's weekly reports, he observed that the same projects were reported each week with minimal progress, leaving him "disillusioned." According to Neece, however, some of the projects were ones he was already working on, and others were long-term tasks that would take time to complete.

In April 2018, two months before Neece's contract was set to expire, the mayor informed Neece that he planned to advertise the position of DPW superintendent and solicit new candidates, but that Neece could still apply for the position. On June 28, 2018, the mayor told Neece he was not renewing Neece's contract.

**B. Legal Proceedings**

Neece sued the city in 2019, alleging that the mayor declined to renew his contract as retaliation for the deposition testimony he gave in the Huber case, in violation of Title VII of the Civil Rights Act of 1964 and the Massachusetts Whistleblower Act.

Both parties filed pre-trial motions related to the city council executive session. A few weeks before the first scheduled trial date, Neece filed a motion seeking an adverse inference instruction, or the exclusion of certain evidence, based on the city's failure to record or otherwise memorialize the executive session. In response, the city revealed that an audio recording of the executive session did exist; however, it then filed a separate motion to exclude any evidence regarding the meeting. It argued that, at the meeting, the city's attorneys were providing their legal assessment to the city council about a pending lawsuit against the city, so attorney-client privilege and the attorney work-product doctrine protected the recording.

The district court denied the city's motion. It determined that (1) during discovery the city waived the attorney-client privilege that would otherwise apply to the executive session by allowing two deposition witnesses to answer general questions about the discussions at the meeting, and (2) the work-product doctrine did not apply. Further, the district court explained, even if attorney-client privilege protected the communications at the executive session, the city still would have to produce the recording for the following reason: "Whether [Neece's] role in the Huber litigation was discussed at the 4/24/2018 executive session is central to his claim of pretext. Two witnesses present at the meeting have offered conflicting

testimony about whether [Neece's] role was discussed, and the recording offers the only means to resolve the discrepancy."  The court's order addressed only whether the recording had to be provided to Neece as part of the pre-trial discovery process.  The court stated that it would decide later if the recording could be admitted as evidence during the trial itself.

The court then ordered the city to produce the recording and a transcript.  But it "recognize[d] the sensitive nature of some of the material in the recording and the possibility that portions would be inadmissible at trial for reasons including likelihood of confusion or unfair prejudice."  Accordingly, the court directed Neece to seek rulings on the admissibility of portions of the recording by filing another pre-trial motion, which Neece did.  Ultimately, however, the court denied Neece's motion, stating that it would rule on admissibility during trial.

The case proceeded to a jury trial, which took place over thirteen days in January 2023.  The city's central defense was that the mayor did not renew Neece's contract because he was dissatisfied with Neece's job performance, not because Neece's deposition testimony supported Huber's gender-discrimination claim.  To that end, the city called seven employees over the course of three days, including Ryczek, the city's director of human resources, the mayor's former chief of staff, the chair of the parks commission, two veteran DPW employees, and Neece's

- 12 -

replacement, all of whom had interacted with Neece and testified that they alerted the mayor to his unresponsiveness and lack of productivity. In turn, to prove his retaliation claims, Neece testified on his own behalf and called as witnesses Huber, three city council members, city attorneys Albano and Moriarty, his former assistant, and the mayor.

During the trial, the parties debated the admissibility of the executive session discussions. On direct examination, Neece questioned members of the city government about statements made at the meeting, and he later attempted to introduce portions of the transcript. The district court limited some of the witness testimony and excluded the transcript. The court's rationale was that the mayor, not the city council, decided not to renew Neece's contract. And because the parties agreed that the mayor was not at the meeting, Neece had to "connect some dots" between the meeting and the mayor. Specifically, he had to demonstrate that the mayor "had th[e] information" conveyed at the executive session, either because he knew about it before the meeting or learned about it afterwards, for it to be relevant at trial. But, despite repeated attempts, the court determined that Neece never connected those dots. When Neece's witnesses were asked whether they told the mayor about what was said at the executive session, they all said no. Critically, Neece also asked the mayor directly whether, before he decided not to renew Neece's contract, he

learned of questions or concerns that city council members raised in the executive session. The mayor answered that he did not.

Thus, the district court ruled that testimony from the city attorneys and city council members about specific statements they made at the meeting, as well as the meeting transcript, was not relevant to Neece's retaliation claims. Further, it determined that certain questions about Albano's presentation to the city council were cumulative, would only waste time, and would confuse the jury, essentially by creating a mini-trial of the Huber case. Finally, the court precluded testimony by the mayor recounting Albano's advice to him about the Huber settlement, finding those conversations protected by attorney-client privilege that the city had not waived.

The jury returned a defense verdict. On the Title VII claim, it found that Neece had proven that he engaged in protected activity and experienced an adverse employment action but failed to establish a causal link between the mayor's non-renewal of his contract and his role in the Huber case. On the Massachusetts whistleblower claim, the jury found that Neece had proven that he disclosed and objected to an activity he reasonably believed violated the law but failed to demonstrate that the city retaliated against him because he did so. This timely appeal followed.

## II. STANDARD OF REVIEW

We review Neece's preserved objections to the district

court's evidentiary rulings for abuse of discretion. See United States v. Rathbun, 98 F.4th 40, 47 (1st Cir. 2024) (examining admissibility of witness testimony under this standard); Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002) (explaining that abuse-of-discretion standard applies to evidentiary determinations concerning a claim of privilege). "An abuse of discretion occurs 'when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them,'" including by making an error of law. Lech v. von Goeler, 92 F.4th 56, 63-64 (1st Cir. 2024) (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998)).

Even if we determine that a district court's evidentiary ruling was erroneous, however, we will not disturb the jury's verdict if the error was harmless, that is, "if it is highly probable that the error did not affect the outcome of the case." McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006).

## III. DISCUSSION

Neece seeks a new trial on the ground that the district court abused its discretion by limiting evidence about the executive session. The court limited this evidence on various grounds, concluding that some was not relevant; some was cumulative or likely to waste time or confuse the issues; and some was

protected by attorney-client privilege.  We address each ground in turn.

Ultimately, we determine that the district court did not abuse its discretion in any of these rulings.  Neece's own witnesses undercut his claim that the mayor learned about what city council members said at the meeting.  Thus, the court did not abuse its discretion in finding that those statements were not relevant to the mayor's state of mind or alleged retaliatory motive.  The city solicitor also testified that Albano recommended settling the Huber case because he thought it had merit, and the record backs up the district court's view that further questions on this topic would waste time and distract from the main retaliation issue in this case.  And, importantly, Neece was able to ask the mayor directly about his knowledge of the topics discussed at the executive session: the Huber settlement, Neece's role in that case, and concerns city council members raised at the meeting.  Finally, the facts supported the court's ruling that certain communications between Albano and the mayor were privileged.

## A. Relevance

We start with the district court's exclusion of evidence on relevance grounds.  Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact" that is "of consequence in determining the action" "more or less probable than

- 16 -

it would be without the evidence." Fed. R. Evid. 401. We have explained that, "to be relevant, the evidence need not definitively resolve a key issue in the case" but rather "need only move the inquiry forward to some degree." Rathbun, 98 F.4th at 51. "Given that relevancy is a quintessential judgment call, we 'give trial judges considerable leeway in deciding whether the contested evidence satisfies'" the relevance standard. Id. (quoting Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010)).

Relevance is "determined on a case-by-case basis, in light of both the particular factual context and the applicable law." Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas, 982 F.3d 20, 28 (1st Cir. 2020). Thus, we begin with the elements that Neece needed to prove to succeed on his retaliation claims under federal and state law.

Under Title VII, it is illegal for an employer to retaliate against an employee for "oppos[ing] any practice made an unlawful employment practice by [Title VII itself]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must prove that (1) they "engaged in protected activity under Title VII," (2) they "suffered an adverse employment action," and (3) "the adverse employment action was causally connected to the protected activity." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010). To establish participation in a protected activity, "the plaintiff need not

- 17 -

show that the conditions [they] opposed 'actually amounted to a violation of Title VII.'"  Id. at 48 (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)).  Rather, they must show only that they had "a good faith, reasonable belief that the underlying challenged actions" amounted to discrimination.  Id. (quoting Fantini, 557 F.3d at 32).  If "the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision."  Id. at 46.  If the defendant does so, "the burden shifts back to [the plaintiff] to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  Id. (alteration in original) (citation omitted).

The Massachusetts Whistleblower Act likewise prohibits an employer from retaliating against an employee who "[d]iscloses . . . to a supervisor or to a public body" or "[o]bjects to, or refuses to participate in an[] activity, policy or practice which the employee reasonably believes is in violation of a law."  Mass. Gen. Laws ch. 149, § 185(b)(1), (3).  To prevail on a claim under the statute, a plaintiff must show that they "engaged in protected activity and that [their] participation in that activity played a substantial or motivating part in the retaliatory action."  Welch v. Ciampa, 542 F.3d 927, 943 (1st Cir. 2008).

- 18 -

Thus, the critical issue in this case was whether the mayor -- the person who decided not to renew Neece's contract -- acted with a retaliatory motive when he did so. Accordingly, as the district court emphasized, for the contents of the executive session to be relevant, Neece had to forge some link between what took place at the meeting and the mayor.

We see no error in the district court's reasoning that what was said at the meeting was relevant only if the mayor knew about it. See Theidon v. Harvard Univ., 948 F.3d 477, 508 & n.44 (1st Cir. 2020) (finding that emails by "one of many voices in a chorus cautioning [university president] against promoting" the plaintiff did not support an inference of retaliation given that the university president, not the writer of the emails, "had the final say" on the plaintiff's promotion); Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009) ("[I]n assessing pretext, a court's focus must be on the perception of the decisionmaker."). After all, the parties did not dispute that the mayor, as opposed to the city council as a body or its individual members, was the one who opted not to renew the contract. And Neece attempted to offer the conversations that occurred at the executive session to prove the mayor's alleged retaliatory motive, to the extent the mayor was "influenced" by the discussions at the meeting.

Against this backdrop, the district court did not abuse

- 19 -

its discretion in determining that certain testimony about statements at the meeting and portions of the meeting transcript were not relevant to the mayor's motive for ending Neece's employment. That is because, as we proceed to explain, the evidence did not reasonably support the inference that the mayor knew about what was said at the meeting.

According to Neece, he should have been able to introduce at trial statements by city council members calling for his discipline -- calls that, he points out, "were requested to be conveyed to the [m]ayor." The problem, however, is that the mayor himself denied ever hearing about these concerns or demands.[2] Further, Neece's own witnesses who were present at the meeting likewise denied talking to the mayor about what was said there. City council members McAuliffe and Frank Laflamme testified that they did not speak to the mayor about the executive session. And

---

[2] Neece contends that city council members called "for there to be some kind of discipline or consequences for [him] as a result of his involvement in [the Huber] case," that is, his deposition testimony that was unfavorable to the city. By contrast, the city maintains that city council members asked whether Neece would face repercussions for erroneously telling Huber that she did not need to meet the 100-pound lifting requirement. The transcript plausibly supports the city's interpretation, and, to the extent the district court relied on that same view of the transcript, it did not abuse its discretion. See Clukey v. Town of Camden, 894 F.3d 25, 34 (1st Cir. 2018) (explaining that, under the abuse-of-discretion standard, we will leave a district court's ruling undisturbed if we are not "left with a 'definite and firm conviction that the court below committed a clear error of judgment'" (citation omitted)).

the only remaining city-council-member witness stated that he did not know if "what went on at that meeting" was communicated back to the mayor. Neece also asked Moriarty and Albano whether they reported to the mayor what happened at the meeting or knew if anyone else did. Both stated that, in the normal course, someone would update the mayor about the meeting but that they did not update him and had no knowledge of anyone else doing so either.

For similar reasons, the district court did not abuse its discretion in excluding portions of the transcript of the executive session, which Neece tried to introduce before resting his case. The court ruled that the transcript was inadmissible because it was not relevant, stating that Neece "had ample opportunity to question the relevant witnesses . . . about this information [from the executive session] being made known to [the mayor], who was the decision-maker[,] . . . and it just wasn't there." The record supports the court's assessment. As the court observed, by the time Neece sought to introduce the transcript, he had already asked the mayor himself, city council members, and the city attorneys about whether the discussions at the meeting ever got back to the mayor. Not a single witness could confirm that they did.

Further, to the extent Neece sought to prove that his deposition testimony and the Huber settlement were "unpalatable" to the mayor or that his deposition testimony provided direct

evidence of discrimination by the city, he was able to ask the mayor directly about those topics. Indeed, in response to Neece's questioning, the mayor confirmed that he knew that Neece's testimony was unfavorable to the city, that Neece had recounted Ryczek's concerns about hiring a woman, and that Neece had documented his conversation with Moriarty and the human resources director about the city's vulnerability to a gender-discrimination lawsuit. Along similar lines, Neece elicited testimony from the mayor that a $140,000 settlement was a "sizeable" expense for the city. As the city notes, Neece could have followed up with leading questions suggesting that the settlement was "unpalatable" but did not do so.

In light of these multiple lines of inquiry by Neece over several days of trial, the record simply does not support Neece's position that it was the district court's relevancy rulings that prohibited him from connecting the dots between the mayor and the executive session. "To be sure, Federal Rule of Evidence 401's standard for relevancy is low . . . ." Ward v. Schaefer, 91 F.4th 538, 544 (1st Cir. 2024). But even against this permissive standard, the court did not abuse its discretion when it found that the city council members' statements at the executive session did not tend to make it more likely than it otherwise would be that the mayor retaliated against Neece because of his role in the Huber case.

- 22 -

Next, we turn to the rest of the challenged evidentiary rulings.

### B. Evidence That Was Cumulative or Likely to Waste Time or Confuse the Issues

The district court also excluded certain testimony from Albano on the ground that it was cumulative and likely to waste time and confuse the issues.

Federal Rule of Evidence 403 permits the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Thus, even if evidence helps inform disputed issues, the district court "can find [its] 'untoward effects' . . . to be so weighty that the evidence should be excluded." Galarneau v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 504 F.3d 189, 205 (1st Cir. 2007) (quoting Faigin v. Kelly, 184 F.3d 67, 80 (1st Cir. 1999)).

In reviewing the district court's evidentiary rulings under Rule 403, we keep in mind that "[t]he balancing act that the rule demands 'is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such fact[-]bound assessments.'" Rathbun, 98 F.4th at 51 (first alteration in original) (quoting United States v. Mare, 668 F.3d 35, 39 (1st Cir. 2012)). Thus, we have declined, "from the vista of a cold

appellate record, [to] reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect" absent "extraordinarily compelling circumstances." Ward, 91 F.4th at 545 (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)). We see no such circumstances here, given the way the trial played out.

We evaluate the district court's rulings in the order in which they occurred at trial. First, during Moriarty's direct examination, Neece sought to introduce a recording of Albano's presentation to the city council. In particular, Neece wanted to introduce Albano's recorded statements that his deposition testimony and the $140,000 settlement were "unpalatable," the Huber case was one of "the best employment discrimination cases" Albano had seen because Neece provided Huber with "direct evidence of discrimination," and, consequently, Neece was a "nightmare witness[]" for the city. After Moriarty testified that he and Albano had met with the city council to discuss the Huber settlement at the mayor's direction, and that he had listened to the recording of the meeting, Neece moved to admit the recording. The court ruled that Neece had not established an adequate foundation for doing so, especially when Neece already had been allowed to question Moriarty about Albano's assessment of the Huber case and demonstrate that Albano thought Huber had a strong claim. The court then asked Neece why he needed to admit the recording of

Albano's statements, and Neece responded that the city was "still fighting the merits of the Huber case."

We see no abuse of discretion in the district court's finding that Moriarty's testimony about Albano's specific statements would have been cumulative and that excluding those statements did not prejudice Neece. See Elwood v. Pina, 815 F.2d 173, 178 (1st Cir. 1987) (explaining district court may properly exclude evidence when it is "repetitive" and the "small increment of probability it adds may not warrant the time spent in introducing it" (citation omitted)). As the court noted, Neece needed to prove only that he had a reasonable belief that the city had discriminated against Huber to establish his own retaliation claims. Thus, Neece "[didn't] have to retry the Huber case here." And, as the court observed, Moriarty had confirmed that (1) Albano thought Huber's case was meritorious, and (2) Albano recommended the city settle the case as a result. For that reason, as the court explained, Neece already had the opportunity to rebut the city's account that the Huber case lacked merit.

Second, during Albano's direct examination, Neece asked Albano whether he (1) concluded that the evidence in the Huber case was harmful to the city and (2) told the mayor that the evidence was harmful. The district court sustained the city's objections to those questions, finding that they were cumulative and wasted time and noting that it was "losing track about what

- 25 -

case [Neece was] trying to prove here."

In the context of Albano's overall testimony, this ruling was within the district court's discretion. We "must 'evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.'" United States v. Varoudakis, 233 F.3d 113, 124 (1st Cir. 2000) (quoting Old Chief v. United States, 519 U.S. 172, 183 n.6 (1997)). Even if what Albano had told the mayor were relevant to the mayor's motive, by the time the city lodged its objections, (1) Neece already had established that Albano kept the mayor informed about depositions in the Huber case, (2) Albano already had described Neece's deposition testimony, and (3) it was obvious that Neece's testimony undermined the city's defense. Indeed, in response to a series of questions, Albano explained that it was Neece who testified to Ryczek's statements expressing concern about hiring a woman in the Central Maintenance Garage, asking what would happen if a female employee became pregnant, and indicating fear of a sexual-harassment suit if a woman were hired to work at the garage. Albano also acknowledged that Neece documented Ryczek's statements. Further, the court reasonably concluded that there was a real potential for confusing the issues because the proceeding risked becoming a mini-trial of the Huber case. See Williams v. Drake, 146 F.3d 44, 48 (1st Cir. 1998) (finding no abuse of discretion in excluding evidence when its "potential for

- 26 -

muddling the issues was real" and it "could well have created an unwarranted sideshow, drawing attention from the main event").

We also see no harm from the district court's decision to limit Albano's testimony. Immediately after its ruling, the court itself asked Albano whether he told the mayor the names of the people -- i.e., Neece -- who gave deposition testimony in the Huber case; Albano indicated that he was not sure. What's more, as we've outlined above, Neece was able to ask the mayor directly whether the mayor knew that Neece's deposition undermined the city's defense.

## C. Attorney-Client Privilege

We now address Neece's final evidentiary claim. At trial, the district court precluded the mayor's testimony about the specific advice Albano gave him regarding the benefits of settling the Huber case, finding that attorney-client privilege protected those conversations. Neece contends that the district court erred in determining both that a privilege between the mayor and Albano existed and that the city had not waived the privilege.

We begin with the foundational legal principles.[3]

_____

[3] Federal Rule of Evidence 501 provides that federal common law governs a claim of privilege, "[b]ut in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Neece seems to presume that, in this federal-question case in which the district court exercised supplemental jurisdiction over his Massachusetts-law retaliation claim, federal privilege law

- 27 -

Attorney-client privilege "safeguard[s] communications between attorney and client, but protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." Blattman v. Scaramellino, 891 F.3d 1, 4 (1st Cir. 2018) (alteration in original) (internal quotation marks omitted) (quoting Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23-24 (1st Cir. 2011)). "That protection ceases, or is often said to be 'waived,' when otherwise privileged communications are disclosed to a third party," because "such disclosure 'destroys the confidentiality upon which the privilege is premised.'" Lluberes, 663 F.3d at 24 (citations omitted). The party that invokes the privilege, here the city, bears the burden of showing that (1) it applies, and (2) it has not been waived. Id.

Turning to the facts here: At trial, Neece sought to prove the mayor's retaliatory motive by asking the mayor whether, as part of Albano's recommendation on the Huber settlement, Albano told him that Neece's testimony had been unfavorable to the city. The city objected, stating that Albano's advice to the mayor on the settlement was a privileged attorney-client communication. The district court agreed, reasoning that Albano and the mayor

applies. The city does not directly challenge that presumption, and neither party argues that federal and Massachusetts law differ on the privilege issues presented here. So, we also apply federal privilege law. See Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011) (applying federal privilege law when parties implicitly indicated it controlled).

- 28 -

were "meeting privately for [the mayor] to be [given] information that would affect his recommendation [to the city council] on the . . . Huber settlement."

We conclude that the district court did not err in this determination. "The objectives of the attorney-client privilege apply to governmental clients." United States v. Jicarilla Apache Nation, 564 U.S. 162, 169 (2011). In particular, "[t]he privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture." Id. at 169-70 (quoting Restatement (Third) of the Law Governing Lawyers § 74 cmt. b (Am. L. Inst. 1998)). Thus, "[u]nless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." Id. at 170. The mayor certainly would be among the city employees covered by the city's privilege because he was an agent of the city (its chief executive) receiving advice from a city attorney about why the city should settle a pending lawsuit against it, all for the purpose of deciding whether to direct the city council to consider the settlement. See In re Cnty. of Erie, 473 F.3d 413, 422-23 (2d Cir. 2007) (holding that attorney-client privilege applied to emails sent from a county attorney to county officials responsible for implementing correctional policies when emails conveyed the attorney's assessment of and guidance on

complying with legal requirements); Restatement (Third) of the Law Governing Lawyers §§ 73-74 (Am. L. Inst. 1998) (explaining that attorney-client privilege generally extends to confidential communications that occur between a government lawyer and government employees and that are made for the purpose of "establish[ing] and maintain[ing] legal positions").

But Neece argues that, for two reasons, the city waived any privilege that would apply to the mayor's conversations with Albano about the settlement. He claims that the district court previously found that the city had intentionally waived any privilege that attached to the discussions at the executive session when the city allowed Moriarty and McAuliffe to testify about those discussions in their depositions, and that this waiver extended to Albano's conversations with the mayor. He also contends that Federal Rule of Evidence 502, which governs waiver of privileged communications, applies here.

The district court rejected these arguments, determining that two distinct claims of privilege existed: first, a privilege that attached to conversations among the city attorneys and city council members at the executive session, and second, "a separate attorney-client privilege between [the mayor] and Attorney Albano regarding their private conversations." The court analyzed the privilege claim for each set of conversations separately.

Neither the district court's rulings about the executive

session nor Rule 502 support a finding of waiver for the mayor's conversations with Albano. As for its earlier orders determining that the audio recording of the executive session was discoverable, the district court found that the city waived the attorney-client privilege that attached to the executive session "by allowing two different witnesses to answer questions about the discussions during the meeting," without "limitations as to the scope of questions that could be posed to [them] about" that meeting. The court's rulings did not address the private conversations between Albano and the mayor, which occurred in advance of the executive session and represent entirely separate communications.

Nor does Rule 502 apply to the circumstances here. That rule provides that when a party waives attorney-client privilege through a disclosure in a federal proceeding, "the waiver extends to an undisclosed communication or information in [the same] proceeding only if" three conditions are met: (1) "the waiver is intentional"; (2) "the disclosed and undisclosed communications or information concern the same subject matter"; and (3) "they ought in fairness to be considered together." Fed. R. Evid. 502(a). We have explained that the "subject-matter waiver" provided for in the rule "is generally reserved for 'situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner.'" Salmon v. Lang, 57 F.4th 296, 326-27 (1st Cir. 2022) (quoting Fed. R. Evid. 502(a)

advisory committee notes). "Such waivers are almost invariably premised on fairness concerns." <u>In re Keeper of Recs. (Grand Jury Subpoena Addressed to XYZ Corp.)</u>, 348 F.3d 16, 24 (1st Cir. 2003). Those concerns arise when a party "partially disclose[s] privileged communications or affirmatively rel[ies] on privileged communications to support its claim or defense and then shield[s] the underlying communications from scrutiny by the opposing party." <u>In re Grand Jury Proc.</u>, 219 F.3d 175, 182 (2d Cir. 2000).

We see no such fairness concerns or selective disclosure here. The city insisted from the outset that the discussions at the executive session, including any advice rendered by the city attorneys, were neither discoverable nor admissible, and it did not selectively disclose information helpful to its cause while concealing other information that was unhelpful. We therefore decline to disturb the district court's ruling.

## D. Harm of the Evidentiary Rulings

We conclude by noting that, even if the district court did abuse its discretion in any of its evidentiary rulings (although we determine it did not), any error was harmless. Neece's central argument is that he was prejudiced by the exclusion of the verbatim statements from the executive session because "the bland and summary questions that" witnesses had answered "had nowhere near the force or the clarity of [the] actual words in the meeting." But in reviewing the record as a whole, we cannot say

it is "highly probable" that the exclusion of those words "affect[ed] the outcome of the case," McDonough, 452 F.3d at 19-20, given both the evidence Neece did introduce and the evidence the city put forth in support of its defense. As for Neece's evidence, we've explained that witnesses, including the mayor, disclaimed that city council members' calls for discipline were relayed to the mayor. We therefore cannot say that the exclusion of those statements impacted the verdict. As for Albano's comments on the impact of Neece's testimony in the Huber case, Neece also put forth evidence on this point. He was able to have both Albano and the mayor confirm on the stand that, prior to recommending a settlement, the mayor knew that Neece provided specific pieces of evidence that were obviously detrimental to the city's defense, and the mayor was concerned about taxpayer money funding a settlement. Finally, through seven witnesses who had interacted or worked directly with Neece, the city introduced substantial evidence that countered Neece's version of why he lost his job, which the jury could have credited to find that the mayor had a legitimate, nonretaliatory reason for not renewing Neece's contract: Neece's performance issues.

"Given the totality of the evidence," the particular statements from the executive session, describing Neece as a nightmare witness for the city and his testimony and the settlement it prompted as unpalatable, "cannot reasonably be understood

- 33 -

as . . . [the] pivotal evidence that [could have] tipped the verdict in favor" of Neece.  Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 64 (1st Cir. 2011).

## IV. CONCLUSION

For all these reasons, we **affirm**.