# United States Court of Appeals
## For the First Circuit

Nos. 23-1458, 23-1884

BORIS O. BERGUS,

Plaintiff, Appellee,

v.

AGUSTIN M. FLORIAN,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Gelpí and Rikelman, Circuit Judges,
and Katzmann,[*] Judge.

T. Christopher Donnelly, with whom Pietro A. Conte and
Donnelly, Conroy & Gelhaar, LLP were on brief, for appellant.

Richard A. Goren, with whom The Law Office of Richard Goren
was on brief, for appellee.

October 22, 2024

_____

[*] Of the United States Court of International Trade, sitting
by designation.

**RIKELMAN**, <u>Circuit Judge</u>.  Agustin Florian and Boris Bergus were once colleagues in Bergus's medical practice and eventually became co-investors in a company run by Florian's brother-in-law.  Bergus ultimately made two separate investments in the company, purchasing stock in both 2012 and 2014.

Years later, after their relationship had soured, Bergus sued Florian in federal court, alleging that Florian had omitted material information about the two investments and thereby violated the Massachusetts Uniform Securities Act ("MUSA").  The trial featured a modest number of exhibits and only three witnesses: Bergus, Florian, and Florian's brother-in-law.  The district court precluded Florian from cross-examining Bergus about conduct that led a state medical board to conclude in 2013 that Bergus had repeatedly misrepresented his medical credentials in a way that was intended to deceive, or had the tendency to deceive, the public.  At the end of trial, the jury returned a verdict in Bergus's favor with respect to the 2012 investment only.

On appeal, Florian challenges several of the district court's rulings, including its limitation on his cross-examination of Bergus.  He points out that this was not a document-heavy case and thus the trial boiled down to whether the jury believed Bergus, who bore the burden of proof as the plaintiff.  He also notes that he sought to cross-examine Bergus about conduct highly probative of truthfulness, given the medical board's findings of deception

and Bergus's agreement to a reprimand and probation based on these findings.

We agree that Bergus's credibility was pivotal to this case and that Florian sought to cross-examine Bergus about conduct that was probative of Bergus's character for truthfulness, as permitted under Federal Rule of Evidence 608(b). Because we cannot discern from the record why the district court decided to preclude even brief cross-examination about the facts underlying the medical board order, we conclude that the court abused its discretion. We therefore vacate the judgment in part and remand for a new trial on the 2012 investment.

## I. BACKGROUND

### A. Relevant Facts[1]

We begin with some details the parties do not dispute before proceeding to the highly contested issues at trial. As the record demonstrates, the district court took a proactive approach to sorting out the facts and claims in this case.

Bergus and Florian are both doctors. After they met in 2011, Florian began working on a contractual basis at Bergus's

---

[1] Because our decision focuses on an evidentiary ruling, we review the record objectively and "present the facts relevant to the . . . ruling[] in a 'balanced' manner." Lech v. von Goeler, 92 F.4th 56, 61 (1st Cir. 2024) (quoting United States v. Velazquez-Fontanez, 6 F.4th 205, 212 (1st Cir. 2021)).

medical practice in Norwood, Massachusetts. The two became friends.

Eventually, Bergus and Florian discussed an investment opportunity with Florian's brother-in-law, Edgardo Jose Antonio Castro Baca, a Peruvian businessman. Baca is the president, board chairman, general manager, and a shareholder of a Peruvian company called Eserapal Juliaca Caracoto SAC (the "Company"). In 2009, Baca began a project on behalf of the Company[2] to develop a water treatment plant and a sewage treatment plant that would serve the Juliaca community in Peru. Baca planned to sell the plants in the future to generate millions of dollars of profit. But before the Company could begin to develop the treatment plants, it needed to secure an exclusive "contract with the City of Juliaca to provide water and sewer" utilities to the area. The Company secured that contract in December 2010. The then-mayor of Juliaca signed the contract, but after he left office in January 2011, the contract required ratification by the new mayor.

At some point in 2011, the new Juliaca mayor demanded a bribe of ten million Peruvian soles (the equivalent of about four million U.S. dollars at the time) to ratify the contract. Baca refused to pay the bribe, and the Company was unable to move forward with the Juliaca project.

_____

[2] The Company was not officially incorporated, however, until December 2010.

In 2012, Bergus and Florian discussed the possibility of Bergus investing in the Company. By that time, Florian already had invested in the Company, acquiring about 20% ownership. On September 24, 2012, Bergus signed a contract via email with Baca, who acted on the Company's behalf, to invest $125,000 for 2.5% of the Company's stock. Bergus wired the money the next day.

In April 2014, the three met in person to discuss Bergus's further investment in the Company. Florian interpreted between Bergus (an English speaker) and Baca (a Spanish speaker). On May 13, 2014, Bergus and Baca signed a second contract in which Bergus agreed to invest an additional $250,000, for a total of 9% of the Company's stock. Bergus wired the amount a week later.

Florian resigned from Bergus's medical practice in October 2015. In April 2016, he sued Bergus in Massachusetts state court for breach of contract and violation of state wage laws, claiming that Bergus had failed to pay him in full for his work at the medical practice.[3] Two years later, Bergus initiated this federal lawsuit, alleging that Florian had violated MUSA by making several material omissions and misrepresentations in connection with Bergus's 2012 and 2014 investments in the Company.

---

[3] The parties correctly agree that we may take judicial notice of the state-court action. See Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 19 (1st Cir. 2004) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990))).

The rest of the story is less clear. At the trial in this case, the parties offered competing narratives about how Bergus became an investor of the Company, whether Florian solicited Bergus's investments (and, if so, to what extent), and whether Florian or Baca informed Bergus about the mayor's bribe before he invested in the Company.

For example, Bergus testified that Florian told him in August 2012 about "a great investment opportunity" that would guarantee him a 10% return within 90 days.[4] According to Bergus, Florian described the Company's project in Peru, explained that the project was near completion and "ready for sale" but needed additional funding "to get the paperwork in order for the sale," and asked him to invest $125,000 in the Company. Then in 2014, Bergus testified, Florian approached him about investing more money, explaining that the project had grown and required additional funding. Although Bergus was unequivocal that it was Florian who provided him with information about both the 2012 and 2014 investments, he also testified that Florian translated for Baca during the 2014 meeting and that Baca showed him maps of the project site, "pictures of the land[,] and pictures of the people."

_____

[4] Bergus initially testified at trial that Florian told him he "could double [his] money in 90 days" but recanted after he was confronted with his deposition testimony that Florian promised a "10 percent" return.

- 6 -

According to Bergus, he had never spoken with Baca in person or over the phone prior to that 2014 meeting.

Florian and Baca, in contrast, testified that Bergus and Baca met in person about the Company in April 2012, before Bergus's September 2012 investment, and that Florian interpreted between Bergus and Baca at that initial meeting. Florian further testified that he never solicited any investment from Bergus and that, although he spoke with Bergus generally about the Company's project, he never represented that the project was near completion or sale. In Florian's telling, Baca provided the answers to Bergus's questions at their meetings and negotiated the terms of Bergus's investment agreements, while Florian merely translated.

The witnesses also presented conflicting testimony about when Florian and Bergus each learned about the mayor's bribe demand. Baca stated that he informed Florian about the bribe before the three met in April 2012. He also testified that he told Bergus about the bribe during their 2012 meeting and that Bergus wanted to invest in the Company anyway. Florian testified inconsistently as to when he learned about the bribe, at times suggesting 2014, then the end of 2015 or the beginning of 2016, and at other times claiming no memory of the date at all. But when Florian's counsel asked Florian whether he "fail[ed] to tell . . . Bergus at the April 2012 meeting that the [Juliaca] mayor had demanded a bribe and the Juliaca project was put on

standby," he answered "[n]o." Bergus, for his part, testified that he was still in the dark about the bribe as late as the April 2014 meeting.

### B. Relevant Procedural History

This case has seen many twists and turns, but we highlight below only the procedural history relevant to the district court's decision to limit Florian's cross-examination of Bergus.

### 1. Bergus's Claims and Florian's Counterclaim

As we previewed earlier, Bergus filed this lawsuit against Florian in 2018, invoking diversity jurisdiction and alleging a violation of chapter 110A, section 410(a)(2), of MUSA.[5] He claimed that, in connection with each of his 2012 and 2014 investments, Florian offered him securities by means of materially false statements or omissions. See Mass. Gen. Laws Ann. ch. 110A, § 410(a)(2) (2024) ("Any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact . . . is liable to the person buying the security from him . . . ."). Florian counterclaimed for abuse of process, alleging that Bergus filed this suit to

---

[5] Bergus also alleged breach of fiduciary duty and violations of subsections 410(a)(1) and (b) of MUSA, but he later voluntarily dismissed these MUSA claims, and the district court dismissed the breach-of-fiduciary-duty claim on summary judgment. That ruling is not on appeal.

retaliate against Florian for filing the earlier state-court action. The parties subsequently agreed that the trial would not include Florian's counterclaim.

## 2. Motions in Limine

Before trial, Bergus filed several motions seeking to admit or exclude certain types of evidence. In one of these motions, Bergus sought to preclude Florian from impeaching him at trial "on collateral matters concerning his medical practice or offering any extrinsic evidence concerning [his] professional conduct . . . to attack [his] character for truthfulness." Bergus explained that Florian proposed to attack his character for truthfulness by providing the jury with a 2013 order from the Rhode Island Board of Medical Licensure and Discipline (the "Medical Board"), which "concern[ed] inaccuracies in [Bergus]'s C.V. and in certain advertising for [his] medical practice" (the "2013 Consent Order"). According to Bergus, Florian also planned to "elicit[] testimony about the purportedly 'unethical' and 'fraudulent' manner in which . . . Bergus has conducted . . . his medical practice." Relying primarily on Federal Rules of Evidence 404(b) and 608, Bergus argued that the 2013 Consent Order should be excluded as improper extrinsic evidence. Bergus also contended that Florian should be prohibited from even cross-examining him about the facts underlying the order, because the order concerned

"collateral matters" and would be "unfairly prejudicial" to him. Bergus did not attach a copy of the order to his motion.

Just four days after Bergus filed the motion about the 2013 Consent Order and before Florian's response to the motion was due, the district court held a final pretrial conference and addressed all pending motions. When the court turned to Bergus's motion to limit his cross-examination, it first requested a copy of the 2013 Consent Order, but neither party had the order on hand. The court then asked Bergus's counsel what the order "actually sa[id]." Counsel responded that it "chides the plaintiff" and then clarified that the order was "critical of the plaintiff's descriptions in his CV and in the way he marketed his medical practice." Based on that representation of the order's contents, the district court provided its preliminary views on the motion:

> I'll put to one side the question of marketing the medical practice. But I want to see the specifics of this. So I want you to file it forthwith, that is so that your friend can respond to it. I'm more than a little skeptical of the kind of treatment of registration statements as being or findings as being the equivalent of a conviction for crimen falsi. That's really what you're asking for on that. And cross-examination of specifics of the way in which [Bergus] conducted his medical practice seem to me to be far too collateral to permit getting in here, but if there's something specific, I'll look at it and you'll get to respond to whatever it is that precisely is --
>
> [Bergus's counsel]: We will file that forthwith.

- 10 -

THE COURT: If it's around, it must be, I'd like to see it and I think your friend has a right to take a look at it as well and the specifics. But this is [my] advice to you. Don't count on that being part of the trial in the case. You've got plenty of stuff to work with. That's not likely to be part of it, and I think it's unfairly prejudicial sufficiently so that I might, quite apart from the application of 404 or 404(b), use 403 to keep it out.

The court then turned to discuss other trial matters.

When Florian filed his response to Bergus's motion a week later, he provided the district court with a copy of the 2013 Consent Order, along with a copy of a 2021 Medical Board order summarily suspending Bergus's medical license (the "2021 Suspension Order"). Florian argued that he should be able to cross-examine Bergus about these orders and the underlying facts because Bergus was relying solely on his own testimony to prove his claims, Rule 608 permitted a witness's credibility to be attacked based on their character for truthfulness, and the Medical Board had "found very specific facts against . . . Bergus which [could] educate the jury about his character for telling the truth."

As Florian pointed out, the Medical Board had concluded in the 2013 Consent Order that Bergus had advertised his "medical business [in a way that was] intended or ha[d] a tendency to deceive the public." It found that Bergus had provided misleading

- 11 -

information about his medical credentials on his medical practice's website, in his CV, and in his communications to the Medical Board.[6] Based on those findings, Bergus "agreed" to a "reprimand on his physician license" and to two years of probation as part of the order. In the 2021 Suspension Order, the Medical Board found that Bergus had been storing "expired medications . . . in patient use areas" (such as patient exam rooms and medication supply rooms). Based on this conduct, the Medical Board concluded that he had violated a Rhode Island law prohibiting "[i]ncompetent, negligent, or willful misconduct in the practice of medicine." And because the public would be in immediate danger if Bergus continued practicing medicine, the Medical Board explained, it suspended his medical license. These two orders, Florian argued, demonstrated that "Bergus ha[d] a history of untruthfulness" and that Florian should have been permitted to cross-examine him about his prior "misrepresentations" and "deceit."

A few weeks after the pretrial conference, the district court issued an electronic order ruling on all of the parties'

---

[6] For example, according to the 2013 Consent Order, Bergus repeatedly misrepresented the length of his post-medical school training, stated that he had "participated in a residency at Brown University" even though he never completed that residency, and claimed, including on his medical practice's website, that he had "completed Fellowship training in a subspeciality of Cardiovascular Surgery at Boston Children's Hospital," even though his fellowship was not in a cardiovascular-related subspecialty.

- 12 -

pretrial motions. It noted that it had afforded Florian time to file written opposition to Bergus's various motions and then stated that it "dispose[d] of the remaining outstanding motions in limine, more or less consistently with my preliminary observations at the pretrial conference." As to Bergus's motion to limit the scope of Florian's proposed cross-examination, the court ruled that "motion 117 to preclude impeachment on collateral matters is GRANTED" and ordered that "no party shall make reference to such matters."

### 3. Trial

In January 2023, just a few days after the district court ruled on the parties' pretrial motions, trial began. Only three witnesses testified: Bergus, Florian, and Baca. After the parties rested their cases, the court discussed with counsel what questions would be included on the verdict form. The court explained that, for each of the 2012 and 2014 investments, the verdict form would first ask the jury whether Florian was engaged in the solicitation of securities purchased by Bergus. If the jury answered "yes" for either investment, it would then continue to the next section of the form, which would list Florian's alleged misrepresentations and omissions. The district court then "turn[ed] to the question of whether or not any of those [alleged] misstatements was material" and explained that it was "prepared to make that determination as a matter of law," depending on Florian's thoughts on the issue. Florian objected, arguing that the issue of

- 13 -

materiality was "obviously a question for the jury." The court ultimately decided not to "put a materiality question to the jury," determining as a matter of law that the alleged misstatements and omissions were material. The final verdict form, as the court previewed, included a list of alleged misrepresentations and omissions for each of the two investments. With respect to the 2012 investment, the omission presented to the jury was that "Florian omitted to tell . . . Bergus that the Mayor of Juliaca had demanded a bribe."[7]

After deliberating for about three hours, the jury returned its verdict, finding that Florian had solicited Bergus's 2012 investment and that he omitted to tell Bergus about the mayor's bribe demand. The jury further determined that Florian had not made any other material omission or misrepresentation in connection with the 2012 investment. As to the 2014 investment, the jury concluded that Florian had not solicited that investment and therefore did not proceed to determine whether he had made any material misrepresentations or omissions in connection with that investment.

### 4. Post-Trial Proceedings

A few months later, the parties appeared before the district court for a hearing on various post-trial motions that

_____

[7] The verdict form included additional questions, but those are not important here.

- 14 -

Florian had filed. During that hearing, the court shared its view that there was no longer a "basis for the exercise of . . . 'supplemental jurisdiction'" and that the parties should litigate Florian's remaining counterclaim in state court. "In the interest of judicial economy" and "proper exercise of federal jurisdiction," the court explained, its final judgment would include a dismissal of Florian's counterclaim.

The district court entered a final judgment in October 2023. As to Bergus's 2012 investment, the court ordered as follows:

> Judgment for . . . Bergus against . . . Florian in the amount of $125,000 . . . ; together with prejudgment interest at the rate of 6% per annum pursuant to M.G.L. c. 110A, § 410(2), from September 25, 2012 to Monday January 23, 2023, in the amount of $77,506.85; for a total Judgment . . . of $202,506.85, and,

> As a predicate to execution of the money judgment and calculation of costs and attorney's fees herein, . . . Bergus shall forthwith tender the [2012 investment] securities . . . .

As for the 2014 investment, the court ordered that Bergus "take nothing." In addition to the $202,506.85 in damages, the district court also awarded Bergus $548,728.01 in attorney's fees, expenses, and costs, resulting in a total judgment against Florian of $751,234.86.

This timely appeal followed.

- 15 -

## II. STANDARD OF REVIEW

"We review a district court's decision to exclude evidence . . . for abuse of discretion." IDC Props., Inc. v. Chi. Title Ins. Co., 42 F.4th 1, 12 (1st Cir. 2022) (quoting Ellicott v. Am. Cap. Energy, Inc., 906 F.3d 164, 172 (1st Cir. 2018)). Under this standard, we will not set aside a court's evidentiary decision unless we are left with "a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019) (quotation marks and citation omitted). A district court abuses its discretion when it overlooks "a relevant factor deserving of significant weight," accords "an improper factor . . . significant weight, or . . . considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. Soler-Montalvo, 44 F.4th 1, 14 (1st Cir. 2022) (quoting United States v. Taylor, 848 F.3d 476, 484 (1st Cir. 2017)).

Even if a court erroneously excludes certain evidence, however, we will not upset the jury's verdict and grant a new trial "if the error was harmless, that is, 'if it is highly probable that the error did not affect the outcome of the case.'" Neece v. City of Chicopee, 106 F.4th 83, 93 (1st Cir. 2024) (quoting McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006)).

- 16 -

To evaluate the probable impact of erroneously excluded evidence on the verdict, we consider "[t]he centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case." Lech v. von Goeler, 92 F.4th 56, 64 (1st Cir. 2024) (alteration in original) (quoting Kowalski v. Gagne, 914 F.2d 299, 308 (1st Cir. 1990)).

### III. DISCUSSION

Florian challenges several of the district court's rulings on appeal. Specifically, he contends that the court erred by: (1) awarding Bergus $125,000 for the 2012 investment, given the jury's rejection of Florian's liability related to the 2014 investment; (2) determining that any omission about the bribe demand was material "as [a] matter of law," thereby taking the materiality issue away from the jury; (3) preventing Florian from cross-examining Bergus about his "repeated public [lies] about his medical credentials" and "misrepresent[ations] to patients that he was treating them with safe, effective medications"; (4) determining the amount of reasonable attorney's fees recoverable from Florian under MUSA; and (5) dismissing Florian's abuse-of-process counterclaim for lack of jurisdiction.

We conclude that the district court abused its discretion when it precluded Florian from cross-examining Bergus about the facts underlying the 2013 Consent Order. Further, because we are unable to conclude that it was "highly probable"

- 17 -

that the error did not affect the verdict, we hold that this error was not harmless. Neece, 106 F.4th at 93 (quotation marks and citation omitted). Given this ruling, which requires a new trial, we bypass Florian's remaining arguments on appeal. See Rhode Island v. Shell Oil Prods. Co., 35 F.4th 44, 53 (1st Cir. 2022) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (quoting PDK Labs. Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part))).

## A. Limitation on Florian's Cross-Examination of Bergus

Although at trial Florian sought to introduce both the 2013 and 2021 Medical Board orders into evidence and to cross-examine Bergus about the orders to undermine Bergus's credibility, on appeal Florian presents a more targeted argument. He now focuses on the district court's ruling prohibiting any cross-examination about the orders as "fatally prejudic[ing]" his case and abandons any claim that the orders themselves were admissible. Framing this as a "he-said/she-said" dispute with only three witnesses (Bergus, Florian, and Baca), Florian argues that his "liability concerning the 2012 [investment] undoubtedly boiled down to the jury's credibility assessments of" him and Bergus. Because the case rose and fell on credibility, Florian contends, he should have been permitted to cross-examine Bergus about the facts underlying the 2013 Consent Order, including the fact that Bergus had misrepresented his medical credentials in a

- 18 -

manner that was designed to deceive or tended to deceive the public. And because the district court restricted such cross-examination "without any ruling from which Florian could discern the court's reasoning," Florian argues, the court abused its discretion.

We begin with the touchstone of our analysis here, Federal Rule of Evidence 608. Under Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," but a district court "may" permit cross-examination about such instances "if they are probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b); see also Lech, 92 F.4th at 65. Further, both Rule 608(b) and Rule 403 grant a district court broad discretion to control the scope and extent of cross-examination. See Tigges v. Cataldo, 611 F.2d 936, 939 (1st Cir. 1979) ("The court . . . has considerable discretion [under Rule 608(b)] to exclude avenues of cross-examination which promise to lead far afield from the main controversy."); United States v. Shinderman, 515 F.3d 5, 16-17 (1st Cir. 2008) (explaining that "a trial court's discretion to determine the scope and extent of cross-examination is broad" but "subject to the overarching need to balance probative worth against prejudicial impact" under Rule 403).

Rule 608(b) plainly barred the admission of the 2013 and 2021 Medical Board orders to prove Bergus's character for untruthfulness, and Florian does not contend otherwise on appeal.[8] The narrower argument he presses is that the district court erred in precluding any cross-examination of Bergus about his conduct underlying those Medical Board orders. Affording considerable deference to the district court in these circumstances, as we must, we conclude that it was well within the court's discretion to preclude cross-examination about Bergus's storage of expired medications. At the same time, and while emphasizing our respect for the district court, we determine that the court did abuse its discretion by prohibiting any cross-examination about Bergus's misrepresentations regarding his medical credentials.

As an initial matter, to the extent the district court concluded that Bergus's storage of expired medications at his medical practice was not probative of his credibility under the terms of Rule 608(b) or "too collateral," we agree. Florian offers

---

[8] Specifically, Rule 608(b) would prohibit Florian from introducing into evidence the 2013 and 2021 Medical Board orders themselves as "specific instances of [Bergus's] . . . conduct for the purpose of showing [his] alleged penchant for untruthfulness." Lech, 92 F.4th at 66; see also id. at 65 (explaining that "extrinsic evidence includes any evidence other than trial testimony" (quotation marks and citation omitted)). Florian does not dispute this conclusion. Instead, he focuses on the second half of Rule 608(b), which permits cross-examination about conduct if it is probative of the witness's character for untruthfulness, so we do too.

no compelling argument on appeal as to how that conduct is probative of untruthfulness as opposed to, for example, carelessness.[9]

By contrast, cross-examination about Bergus's repeated misrepresentations of his medical credentials to two state medical boards, to a hospital and a health plan, and on his own website -- in a manner that tended to deceive the public -- would have been probative of Bergus's character for untruthfulness. See, e.g., United States v. Simonelli, 237 F.3d 19, 23 (1st Cir. 2001) (explaining that whether prior conduct is probative of untruthfulness under Rule 608(b) depends on whether the prior conduct is likely to have occurred and similar to the conduct at issue, or remote in time or cumulative of other evidence, and concluding that deceptive business practices such as altering time cards and inflating bills tended to show untruthfulness); United States v. Fulk, 816 F.2d 1202, 1205-06 (7th Cir. 1987) (holding that Rule 608(b) allowed cross-examination about the suspension of the defendant's chiropractor license for deceptive practices); United States v. Whitehead, 618 F.2d 523, 528-29 (4th Cir. 1980) (permitting cross-examination about the defendant's suspension

---

[9] We briefly add that Florian, relying on the 2021 Suspension Order, suggests that the Medical Board suspended Bergus's license "for misrepresenting to patients that he was treating them with safe, effective medications."  The order, however, details the Medical Board's findings that Bergus was storing expired medications in patient care areas at his two medical offices.

from legal practice for "conduct involving deceit or misrepresentation"). Of course, the district court did not have the benefit of having the 2013 Consent Order before it, or Florian's briefing on the issue, when it offered its preliminary views about the evidentiary value of the order and the conduct underlying it. And as we explained above, any decision to exclude the order itself as inadmissible extrinsic evidence under Rule 608(b) was correct. Similarly, although neither party had brought up Rule 609, the district court rightly noted that this rule also would not have permitted admission of the 2013 Consent Order because the order was not equivalent to a criminal conviction.[10]

As to why the district court concluded that Florian could not cross-examine Bergus about the conduct underlying the 2013 Consent Order consistent with Rule 608(b), however, the record is unclear. See Lech, 92 F.4th at 66 (noting that although Rule 608(b) prohibited defendants from playing recordings of phone calls in which plaintiff lied, it did not restrict them from asking her "on cross-examination whether she lied during the phone calls"). Based on Bergus's representations about the contents of

_____

[10] In particular, the district court stated that it was "skeptical of the kind of treatment of registration statements as being or findings as being the equivalent of a conviction for crimen falsi." We read that reasoning to refer to Rule 609, which permits a party to attack a witness's character for truthfulness with evidence of a conviction for crimes involving dishonesty. See Fed. R. Evid. 609(a). We agree with the district court that Rule 609 does not apply here.

the order during the pretrial conference, the district court suggested that "cross-examination of the specifics of the way" that Bergus "conducted his medical practice" would be "far too collateral," a factor under Rule 608(b). Then, in another reference to the 2013 Consent Order itself, the court also stated: "I think it's unfairly prejudicial sufficiently so that I might . . . use 403 to keep it out."

The parties treat the district court's decision to preclude all cross-examination about the facts underlying the 2013 Consent Order as falling under Rule 403, and so do we. This approach makes sense given the similarity between the analyses required under Rule 608(b) and Rule 403. With regard to whether cross-examination about prior conduct should be permitted, the ultimate question under both rules is the same: Is the conduct probative enough, relative to "the potential dangers and costs of the evidence," that the conduct is worth delving into at trial? Simonelli, 237 F.3d at 23 (noting that the principles controlling a district court's discretion under Rule 608(b) are "recognized in Rules 403 and 611").

Thus, we turn to Rule 403. Even when testimony is admissible under Rule 608(b), a district court may still exclude it under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Fed. R. Evid. 403; see also Shinderman, 515 F.3d at 16–17.  Relying on this principle, Bergus argues that the district court had the discretion to preclude cross-examination by Florian about the facts underlying the 2013 Consent Order as "unfairly prejudicial."

The record does not indicate why the district court concluded that it would be unfairly prejudicial for Florian to cross-examine Bergus, even briefly, about Bergus's previous representations of his medical credentials.  But of course district courts need not always make "explicit [Rule 403] findings." United States v. De La Cruz, 902 F.2d 121, 123 (1st Cir. 1990); see also United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014) ("We give great deference to a district judge's balancing of probative value versus unfair prejudice. . . . even when a judge does not expressly explain the Rule 403 balancing process on the record."). Thus, "[w]here the record is silent, we have on prior occasions . . . independently engaged in that analysis without resort to the district court's decision." United States v. Smith, 292 F.3d 90, 98 (1st Cir. 2002); see, e.g., De La Cruz, 902 F.2d at 123 n.1 ("Despite the lack of express findings, we believe that the record reflects the district court's awareness of its responsibility to weigh the relevant factors and perform a balancing test prior to allowing the government to use the disputed evidence.").

Based on an independent analysis, we agree with Florian that it was an abuse of discretion to prohibit all cross-examination about the conduct underlying the 2013 Consent Order as unfairly prejudicial to Bergus.[11]  Certainly, asking Bergus about conduct that the Medical Board had found "intended to deceive or ha[d] a tendency to deceive the public" would be prejudicial to him.  That is especially so when Bergus's representations about his credentials were arguably made for the purpose of financial gain.  But "[w]e long have recognized that all evidence is meant to be prejudicial" and that Rule 403 prohibits "only <u>unfair</u> prejudice."  <u>Shinderman</u>, 515 F.3d at 17 (quotation marks and citation omitted).

Further, under Rule 403, "the evidence's dangers of unfair prejudice" must "<u>substantially</u>" outweigh -- not merely "somewhat" outweigh -- the evidence's probative value. <u>Soler-Montalvo</u>, 44 F.4th at 16.  And "unfair prejudice ensues when particular evidence 'serves only to evoke an improper emotional response' and distracts 'from careful consideration of the relevant issues.'"  <u>Kilmartin</u>, 944 F.3d at 335 (quoting <u>United States</u> v. <u>Fulmer</u>, 108 F.3d 1486, 1498 (1st Cir. 1997)).  But Bergus offers no reason why cross-examination about how he represented

---

[11] In so holding, we do not imply that the district court made an elementary mistake.  The facts underlying the 2013 Consent Order were not presented to the district court with utmost clarity.

his medical credentials to the public would serve only to evoke "an improper emotional response." Id. Nor does he explain more broadly how he would have been unfairly prejudiced by such cross-examination or argue that the danger of any prejudice substantially outweighed the evidence's probative value. Additionally, the district court likely could have mitigated the potential for unfairness by providing an appropriate limiting instruction if requested. See Davignon v. Hodgson, 524 F.3d 91, 113 (1st Cir. 2008); see also Rubert-Torres v. Hosp. San Pablo, Inc., 205 F.3d 472, 479 (1st Cir. 2000) ("Because the Federal Rules of Evidence favor the admissibility of evidence, less intrusive measures to minimizing the prejudicial effect of evidence are preferred to excluding evidence.").

Finally, we note that Bergus does not even argue that cross-examination on the topic of his prior representations would risk implicating Rule 403's other concerns: "confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. And of course Florian would have been "stuck" with the answers Bergus provided during the cross-examination, and the district court would have been well within its discretion in instructing counsel to move on if the questioning on this topic were taking too long. See Lech, 92 F.4th at 66 (explaining that the cross-examining party is "stuck

with the witness's answer" (quotation marks and citation omitted)).

## B. Harmless-Error Inquiry

We now turn to consider whether "it is highly probable that the error [in precluding the evidence] did not affect the outcome of the case." Neece, 106 F.4th at 93 (quotation marks and citation omitted). When viewing "the record as a whole," we conclude that limiting Florian's cross-examination of Bergus was not harmless. Lech, 92 F.4th at 64.

Importantly, as Florian notes, Bergus bore the burden of proof here and his case rested on his own testimony that Florian did not disclose the Juliaca mayor's bribe demand before he invested. This was not a document-heavy case, and there was no other witness who corroborated Bergus's side of the story. Put simply, "the case hinged on [the jury's] competing credibility assessments" of Bergus and Florian. Id. at 70 (concluding that exclusion of testimony from sole witness who could corroborate plaintiff's testimony was not harmless because "case centered on a credibility battle between" the parties). Bergus's success at trial was therefore dependent on the jury's finding that he was a more credible witness than Florian.

Further, in our view, the probative value of the conduct underlying the 2013 Consent Order was not minimal. The underlying facts concerned deceiving the public, arguably for financial gain,

and Bergus had agreed to accept a reprimand on his license and two years of probation as a result.

In an effort to demonstrate harmlessness, Bergus points out that "Florian chose not to cross examine Bergus about what, if anything, in 2012 Bergus was told about the Juliaca mayor's demand for a bribe." He also argues that "[n]either on direct examination of Florian nor cross examination of Bergus did Florian's counsel . . . seek to elicit opinion testimony about Bergus' purported character for untruthfulness."

We are not persuaded. The fact that Florian chose not to cross-examine Bergus on what he was told about the mayor's bribe demand is hardly surprising. Bergus unequivocally testified on direct examination that Florian did not tell him about the bribe demand before he made his 2012 and 2014 investments. And Florian argued in his opposition to Bergus's motion that he had "knowledge to testify to . . . Bergus'[s] reputation for truthfulness at work and in the medical profession," and the district court, in granting Bergus's motion, prohibited Florian from offering such testimony on direct examination.

In sum, we conclude that cross-examination about Bergus's conduct underlying the 2013 Consent Order could have impacted a reasonable juror's evaluation of the trial evidence, including the comparative credibility of Bergus and Florian. See Lech, 92 F.4th at 64 (considering in harmless-error analysis "[t]he

- 28 -

centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case" (alteration in original) (quotation marks and citation omitted)); cf. United States v. Mulinelli-Navas, 111 F.3d 983, 993 (1st Cir. 1997) (concluding that limitation on cross-examination was not harmless in criminal case because proof of defendant's knowledge relied solely on government witness's testimony and allowing the cross-examination could have allowed jury to discredit witness's testimony). Thus, we cannot say that it was "highly probable that" the court's limitation on Florian's ability to cross-examine Bergus "did not affect the outcome of the case." Neece, 106 F.4th at 93 (quotation marks and citation omitted).

### IV. CONCLUSION

For these reasons, we **vacate** the judgment as to the 2012 investment as well as the dismissal of Florian's counterclaim, and we **remand** for a new trial on the 2012 investment and any other proceedings consistent with this opinion.[12] The jury's verdict as

---

[12] See Dopp v. HTP Corp., 947 F.2d 506, 518 (1st Cir. 1991) ("An appellate court has broad discretion to remand for a new trial on all, or only some, of the issues in the case."); see also, e.g., Holdam v. Middlesex Supply, Inc., 355 F.2d 122, 124-25 (1st Cir. 1966).

We make one final point about the scope of any new trial. Florian argues that the jury's verdict on the 2014 investment precludes, as a matter of law, a verdict against him on the 2012 investment, but we disagree. Bergus purchased 3,750 shares, or 2.5% of the Company, for $125,000 under the 2012 contract. Later,

to the 2014 investment remains intact.  The parties shall bear their own costs.

<hr />

Bergus and the Company executed the 2014 contract, which required an additional investment by Bergus of $250,000 and increased his equity to 9% of the Company.

Florian claims that the initial 3,750 shares Bergus purchased in 2012 were "cancelled" in 2014 as partial consideration for Bergus's increased 9% stake in the Company.  Florian then argues that because Bergus received value for those initial 3,750 shares as part of the 2014 transaction the jury concluded was lawful, Bergus no longer owned those shares and was not entitled to damages under MUSA for the 2012 purchase.  See Mass. Gen. Laws ch. 110A, § 410(a)(2) (2024).

The record belies Florian's argument that Bergus returned his initial 3,750 shares in 2014.  The minutes of the Company's shareholders meeting confirm that the 2014 contract involved a "transfer[] of 9,750 . . . shares equivalent to 6.5% in equity stakes" that resulted in "a new total of 13,500 shares" for Bergus, equivalent to "9.0% of capital shares."  The 2014 contract therefore represented an additional purchase by Bergus of 9,750 shares for $250,000, and Bergus continued to own the 3,750 shares he purchased in 2012, for a total of 13,500 shares.  Thus, Bergus is not precluded from pursuing a MUSA claim about the 2012 investment at a new trial.